Filed 8/7/25  P. v. Escalera CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEJANDRO ESCALERA,<br><br>    Defendant and Appellant. | H051279<br>(Santa Clara County<br>Super. Ct. No. C2113216) |

A jury found defendant Alejandro Escalera guilty of inflicting corporal injury on a spouse, resulting in a traumatic condition.  The trial court granted a three-year term of probation with 180 days in county jail.

Escalera raises four claims on appeal.  First, he contends the trial court erred by admitting evidence of verbal abuse as domestic violence propensity evidence under Evidence Code section 1109.  Second, Escalera contends the trial court erred by admitting testimony about the reactions displayed by him and his wife in response to investigators' efforts to serve her with subpoenas.  Third, he contends the trial court erred by admitting expert testimony about intimate partner violence.  Finally, he contends the cumulative prejudice from multiple errors requires reversal of his conviction.

For the reasons below, we conclude these claims are without merit, and we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Procedural Background*

The prosecution charged Escalera with one count of inflicting corporal injury resulting in a traumatic condition on a spouse. (Pen. Code, § 273.5, subd. (a).)[1] A jury found Escalera guilty as charged. The trial court suspended imposition of sentence and granted a three-year term of formal probation with 180 days in county jail. Escalera timely appealed.

### B. *Facts of the Offense*

In September 2021, Escalera and C. Doe had been married for two years. The couple had two young children. The prosecution alleged Escalera verbally abused Doe on multiple occasions during their marriage, and that the abuse culminated in him physically assaulting her on September 5, 2021.

#### 1. *Neighbors' Testimony*

Diana Ngo and Rebecca Mariscal were neighbors in the apartment complex where Doe and Escalera lived. On the night of the incident, Ngo heard a child crying and a male voice yelling loudly for several minutes. She heard the front door open and slam shut a couple times, followed by the voice of a woman calling out, "Somebody help me." Ngo ran outside and saw Escalera holding a child in the parking lot while Doe was trying to grab the child from him. Doe said, "He's trying to take the child away from me." Escalera let the child go when other neighbors started coming out, and Ngo called 911 to report a domestic violence incident.

Doe was emotional and trembling, and she looked disheveled. Her face looked swollen, but Ngo did not recall seeing any bruises. Doe stated "over and over" that Escalera had threatened to take the child, and she said he had pinned her down by her head or neck. Ngo never saw Escalera put his hands on Doe.

---

[1] Subsequent undesignated statutory references are to the Penal Code.

2

Mariscal was in her condominium when she heard someone yelling for help. She and her husband went outside, and Mariscal saw Doe running after Escalera, who was carrying their son. Doe was yelling, "Help, help, help, he's taking my son." Doe was reaching out, trying to grab and stop Escalera. The child was reaching back toward Doe. The child was distressed, crying, and "kind of screaming." Mariscal's husband said, "Is there a problem?" Escalera then stopped and handed the child to Doe.

Escalera kept walking while Mariscal stayed with Doe and her child. Doe was disheveled, distraught, and crying. Mariscal could not recall Doe's exact words, but she said something like, "He hit me, and he's been hitting me." One of her cheeks was red and a little bruised, and she pointed to a clump of hair on the ground. Escalera, who seemed relatively calm, stayed in the parking lot and made a call on his phone. Mariscal never saw him put his hands on Doe.

### 2. Police Investigation

Police Officer Schatz and another officer arrived at the complex and found Doe sitting on the front steps holding her children. She was visibly shaken and her voice sounded frightened. Doe complained of pain in the back of her head and her right arm. Officer Schatz saw redness on her left cheek and scratches on her left arm. He or his partner took photographs of the injuries, several of which the prosecution introduced into evidence.

The prosecution also introduced into evidence three video clips recorded from Officer Schatz's body camera during his interaction with Doe. Doe told Officer Schatz, "My husband has been verbally abusive to me and today is the first day that he started beating me up." Doe said she and Escalera had been arguing, and he began calling her names like "cunt," a "C-sucking W-word," and a "broke-ass bitch." He then started throwing her things, and he hit her hand away when she tried to stop him.

Doe said she was holding their two-year-old son in her arms when Escalera ripped the child away, put him down, and started beating her up. He hit her, and she fell to the

3

floor. Doe said things started to get "blurry" at some point, but she recalled that Escalera had her pinned to the floor with his knee on her face or neck. When she tried to get up, he dragged her by her hair, ripping it out. Officer Schatz saw that Doe was holding a "clot of hair" in her hand. She said that Escalera had ripped it out.

Doe estimated that Escalera hit her approximately four or five times. She was uncertain whether he hit her with a closed fist or an open hand, but she thought he had his hand open. Escalera then took her phone and keys, and he left the house with their two-year-old son. Doe asked Officer Schatz for a restraining order against Escalera.

Officer Schatz looked around the living room where Doe said the assault occurred. He saw a hole in the wall near the door, and he noticed that "some of the stuff in the living room was disheveled."

### 3. *Testimony of C. Doe*

Doe received a subpoena to testify at trial, and the prosecution granted her immunity for her testimony. She did not want to testify because she found it traumatizing and stressful to talk about the incident, but she felt pressured by the prosecution to testify. At the time of trial, Doe was 39 years old, she was living with Escalera, and she was unemployed. In September 2021, Escalera was paying their apartment rent, and Doe was reliant on him for food and other necessities. She stayed home and took care of the children.

After they had been married for more than a year, Escalera started verbally abusing Doe, calling her derogatory names and using curse words like "bitch." Doe estimated that it happened about every two weeks. He also made threats regarding child custody, and Doe feared she might lose the children. The prosecutor asked Doe about multiple specific instances of verbal abuse, but she could not recall most of them, and she did not recall telling her mother about them. Doe remembered that sometimes Escalera made fun of her for crying, and he once threatened to throw away some gifts she gave

4

him for Father's Day, but she could not recall any of the other incidents the prosecutor asked her about. The verbal abuse never caused Doe to fear for her personal safety.

On September 5, 2021, Doe and Escalera were driving home from a relative's birthday party when they got into an argument. Doe told Escalera she thought he was looking at another woman in "a lustful way," and he denied it. Later, when they were in the apartment, Escalera started yelling at Doe and calling her curse words like "cunt," "bitch," and "whore." He emptied the contents of a diaper bag onto the floor.

Doe testified that she was standing next to a table in the living room when Escalera pushed her, and she fell backwards onto the floor. She could not recall how far she traveled when she fell because she had a gap in her memory. She recalled looking up from the floor and seeing Escalera's knee in the air, but she was not sure whether his knee touched her body. She was moving her legs and trying to get up, but she could not get up. She could not remember if she felt any pressure anywhere on her body, and she did not know where Escalera was because she had her eyes closed at the time. After being on the floor for "[p]robably seconds," Doe got up and went towards the doorway, where Escalera was standing with their older son. Escalera went out the door with the child, and Doe chased after them. She wanted her son back because she "had a safety concern" after the incident. She was able to catch up to them, whereupon she grabbed Escalera's shirt and he handed the child to her. She remembered calling out for help once she got outside, and she remembered speaking with some neighbors.

Doe did not remember Escalera hitting any part of her body with his hand or pulling her hair. She noticed some hair coming out of her head after the incident, but she believed it was the result of postpartum hair loss. Her head did not hurt at all.

Doe testified that she was in a state of shock and distress when the police arrived and took her statement. She could not recall making the statements detailed in the police report. Doe recalled having a mark under her left eye after the incident, but she did not know how it happened or what could have caused it. She could not remember having any

5

other injuries to her body, and she could not remember what caused her to have a clump of hair. Doe assumed Escalera had her keys and phone, and she thought the police gave her keys to her, but she was not sure. The police gave her phone to her. Doe could not recall what caused the damage to the wall.

After the incident, Doe took her children to her parents' house, where they stayed for about a month at her parents' suggestion. The prosecutor showed Doe several photos of parts of her body, and Doe thought her mother might have taken the photos, but Doe could not recall if they were taken close to the time of the incident. The prosecutor showed Doe a clump of hair, and Doe testified it was not the clump of hair she found on the night of the incident, but rather that the hair came out when she was brushing her hair at her mother's house.

### 4. *Testimony of Richard Ferry*

Richard Ferry, a licensed marriage and family therapist, testified for the prosecution as an expert on domestic violence and the common experiences of recipients of intimate partner violence. He had never met with Doe or Escalera, and he was not familiar with the facts and charges of the case. Ferry summarized his testimony as "speaking about the common experiences of people who've been battered in an intimate relationship." He testified that he was not there to opine on whether Escalera was guilty, and he added that it would be a misuse of his testimony to interpret it as an indication that Escalera was either guilty or innocent.

Ferry described eight categories of intimate partner violence: financial abuse; imposing isolation on the partner; turning the children against the partner; verbal and emotional abuse; the making of threats; stalking and harassment; physical violence; and sexual violence. Ferry testified that intimate partner violence does not necessarily have to involve physical violence. It involves the use of power to establish and maintain dominance and control over one's partner, and it does not require physical violence. Threatening divorce could be abusive if the abuser has the ability to carry out the threat,

6

and the partner is still in love with the abuser or is financially and emotionally dependent on them.

Ferry testified that it is very common for an abused partner to recant prior statements of abuse in legal settings. Recantation can include avoiding the service of a subpoena, thwarting the prosecution's efforts to investigate the case, refusing to be interviewed, refusing to appear in court, or taking the stand to testify that the abuse never happened. This would also include minimizing the behavior of the abuser. It may be necessary for the abused partner to take back an accusation of abuse to guarantee their own safety or ingratiate themselves further with the abuser. The victim may also sincerely believe that if they get the abuser out of trouble, the abuser will recognize the victim's value to them and the abuse will cease.

One common misconception is the belief that if an abused partner wants to stay in a relationship, the abused partner must not be experiencing suffering. The abused partner may stay in the relationship because it is logistically difficult to get out of it—e.g., where the couple have children and the abused partner needs the abuser to provide financial or practical support in raising the children. The abused partner may also maintain strong, affectionate feelings for the abuser, causing the partner to engage in magical thinking or "toxic hope" that the abuse will end if the partner can just "get through" to the abuser.

Another myth is the belief that if the victim did not call the police or report prior incidents of abuse, the abuse must not be that bad. The victim may have made a calculation that calling the police would make things worse because the likelihood of getting effective help is less than the likelihood that the abuser will retaliate.

### 5. *Testimony of C. Doe's Parents*

T.S. is Doe's father, and D.S. is her mother. Both parents went to Doe's apartment complex shortly after the incident in September 2021. By the time they arrived, the police and paramedics were there. T.S. testified that Doe was crying and distraught, and she had bruising under her eye. D.S. testified that Doe looked like she

7

was in shock, and she had a red mark under her left eye. D.S. took photos of Doe's injuries the day after the incident. The photos show bruising on Doe's chest and under her eye, and she had scratches on her arm and back. Doe and her children stayed with her parents for three weeks after the incident.

Doe spoke with D.S. every day, and sometimes Doe would call her multiple times a day. Doe frequently called D.S. in a state of distress, and D.S. could hear Escalera yelling and sounding aggressive in the background. He was often threatening to divorce Doe. T.S. testified that Doe also called him in a hysterical state approximately five times. T.S. could hear yelling in the background each time. Doe told T.S. that Escalera had been verbally abusing her.

At some point, D.S. began taking notes of her calls with Doe. D.S. described receiving the following calls from Doe while she was crying and hysterical:

On December 20, 2020, Doe said Escalera was trying to record her "for divorce reasons to take the kids away from her."

On December 21, 2020, Doe said Escalera was calling her a "crazy bitch." Escalera was threatening to stop paying the rent and told Doe she would not have a place to live.

On December 23, 2020, Doe said Escalera was calling her "dumb," "stupid," "bitch," and "cunt." Escalera's mother had bought gift cards for their family, and he gave the children their gift cards but withheld the card his mother had bought for Doe.

On December 24, 2020, D.S. could hear the children crying in the background. Escalera was asking Doe to leave and he was refusing to help her put the children's car seats in the car.

On July 29, 2021, Doe said Escalera had gotten mad about something Doe said, and he threw a knife into the sink, breaking some glass dishes.

On August 2, 2021, Doe said she had bought some tennis shoes and a picture video of the children as gifts for Escalera, but he threw them in the trash.

On August 3, 2021, Doe said Escalera was telling their son to call Doe crazy.

On August 5, 2021, Doe said Escalera told her he did not love her and asked her to leave. Escalera threatened to send an e-mail about D.S. and T.S. to the overseer of the church where T.S. was a pastor, in an attempt to keep Doe and the children from living with D.S. and T.S.

D.S. testified that after the September 5, 2021 incident, she continued to receive calls from Doe in a hysterical state. At one point, Escalera was threatening to get a restraining order and a divorce.

Both T.S. and D.S. testified that they had never witnessed any physical abuse between Doe and Escalera.

### 6. Testimony of Alejandro Escalera

Escalera took the stand in his defense. He testified that on the day of the incident, they were driving home from a relative's birthday party. Doe told Escalera she did not like him talking to, looking at, or liking another woman who was at the party. When they got home, Escalera told Doe he did not like her comments about infidelity. As she was walking past him, she unintentionally bumped him with her elbow, and he told her he was going to take a walk. The interaction escalated when Escalera said, "I'm taking [Child]," and Doe responded, "You're not taking [Child] from me." Doe moved to block the door, whereupon Escalera went to another door and Doe moved away from the front door. Escalera then took Doe's cell phone and walked outside to make a call. He testified that he took her phone because he had left his own phone at the party. He admitted that he told her, "You're acting like a bitch," but he denied calling her "cunt" or "whore."

As Escalera was leaving, Doe started yelling for help. He testified that he wanted to call the police because he felt "it looked bad" given that he was 6 feet 3 inches tall and she was only 5 feet 5 inches tall. When Escalera got outside, he called the police with the phone in one hand while holding his son in the other arm. Doe chased after Escalera and

started pulling on his arm, so Escalera handed his son to her. He saw neighbors coming outside and congregating around Doe while he waited alone by the car. He had the keys to her car because he had been unloading things from the car prior to the argument. Escalera testified that he only intended to take his son on a walk, which was something he did regularly.

Escalera testified that he did not know what had caused the red mark on Doe's face or the scratches on her arm, and he denied that he caused either injury. When asked whether Doe fell or hit the ground at any point during the incident, Escalera responded, "Not that I know of." He denied doing anything to pull hair out of her head, and he explained that she had been losing hair since before the incident. Escalera denied that he caused the bruise on Doe's chest and he testified that she had always had that bruise. Defense counsel showed Escalera a photo of Doe with a bruise on her chest, and he testified that he had taken the photo in April 2020.

Escalera estimated that he and Doe got into arguments about once or twice a month. He admitted he had told her she was "acting like a bitch," but he never called her any other mean names. Escalera testified that he had brought up the possibility of divorce with Doe because he did not want his children to be subjected to years of arguing. He never threatened to take the children away from her and expressed a desire for equal custody, but she was not happy about that.

Escalera testified that he never threw away the birthday gifts Doe gave him, and he denied throwing a knife into the sink. Escalera said he was cooking and cleaning when he dropped a knife in the sink, breaking some plates. He did not know what had caused the hole in the wall.

Escalera admitted that he told Doe the incident was an "accident," but he testified that he was referring to the "whole situation" and how the argument escalated. He denied physically attacking her on the day of the incident, and he said he had never been physically abusive toward her before the incident. Doe has never been physically abusive

10

toward him either. Escalera admitted that he "exaggerated" when making statements to the police about Doe causing physical injuries to him and the children.

## II. DISCUSSION

### A. Admission of Evidence That Escalera Verbally Abused Doe

Prior to sentencing, Escalera moved for a new trial on the ground, among others, that the trial court had erred by admitting evidence he had verbally abused Doe on numerous occasions. He argued the testimony by Doe's parents about the contents of her phone calls recounting episodes of verbal abuse was not admissible as propensity evidence under Evidence Code section 1109, and that it should have been excluded as unduly prejudicial under Evidence Code section 352. The trial court denied the motion.

On appeal, Escalera contends the trial court abused its discretion by denying his motion for a new trial. The Attorney General contends the trial court's denial of the motion was not an abuse of discretion because the testimony about Escalera's verbal abuse was properly admitted as propensity evidence under Evidence Code sections 1109 and 352.

#### 1. Legal Principles

##### a. Motion for a New Trial Under Penal Code Section 1181

After a verdict against a defendant, a trial court may grant the defendant's motion for a new trial "[w]hen the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial," among other grounds. (§ 1181, subd. 5.) The erroneous admission of evidence may provide grounds for granting a defendant's motion for a new trial. (*People v. Perkin* (1948) 87 Cal.App.2d 365, 369.) However, a trial court may grant a motion for new trial only if the defendant demonstrates reversible error. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Clair* (1992) 2 Cal.4th 629, 667.)

11

A trial court's ruling on a motion for new trial is reviewed for abuse of discretion. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 17.) "A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 524 (*Davis*).) "If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.)

### b. *Admissibility of Propensity Evidence Under Evidence Code Section 1109*

When a defendant is accused of an offense involving domestic violence, Evidence Code section 1109 provides an exception to the general prohibition on propensity or character evidence set forth in Evidence Code section 1101. With certain exceptions not applicable here, "evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).) Evidence Code section 1109 thereby "permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes," provided evidence of the other acts is not excluded by Evidence Code section 352. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.)

Evidence Code section 1109 incorporates the definition of "domestic violence" set forth in section 13700. (Evid. Code, § 1109, subd. (d)(3).) As relevant here, that definition of "domestic violence" includes "abuse" committed against a spouse. (§ 13700, subd. (b).) Subdivision (a) of section 13700 defines "abuse" as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in

reasonable apprehension of imminent serious bodily injury to himself or herself, or another."

Additionally, Evidence Code section 1109 expands the definition of "domestic violence" under certain conditions: "Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3).) As relevant here, Family Code section 6211 defines "domestic violence" to include "abuse" perpetrated against a spouse, among others. "Thus, there are two definitions of domestic violence applicable to section 1109, one in the Penal Code and another in the Family Code." (*People v. Mani* (2022) 74 Cal.App.5th 343, 359 (*Mani*).)

The Family Code also contains another definition of "abuse." Family Code section 6203 provides: "(a) For purposes of this act, 'abuse' means any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320. [¶] (b) Abuse is not limited to the actual infliction of physical injury or assault." Family Code section 6320 allows the court to enjoin a party from, among other things, "disturbing the peace of the other party." (Fam. Code, § 6320, subd. (a).) Family Code section 6320, subdivision (c) provides, in relevant part, that " 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party."

Under Evidence Code section 352, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger

13

of undue prejudice, of confusing the issues, or of misleading the jury." "In conducting the careful weighing process to determine whether propensity evidence is admissible under section 352, trial courts 'must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . .' [Citation.]" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 535 (*Kerley*).)

### 2. *Procedural Background*

The prosecution moved in limine to admit testimony from Doe's parents relaying numerous statements she made to them about incidents in which Escalera had verbally abused her. The trial court held a hearing under Evidence Code section 402 to take the testimony of Doe's parents outside the presence of the jury. Among other incidents, Doe's mother testified about various phone calls and statements by Doe in which Doe described Escalera calling her derogatory names, yelling at her aggressively, telling her to leave, and threatening to divorce her. Sometimes Doe's mother could hear Escalera's voice yelling in the background, and she spoke with him directly on some occasions. Doe's father described similar conversations he had with Doe in which she described Escalera engaging in abusive behavior toward her.

The trial court ruled that, subject to a proper foundation, the prosecution could admit evidence of verbal abuse, and the court admitted evidence of four specific allegations of conduct by Escalera that involved more than purely verbal abuse: (1) that he threw a knife in the kitchen sink, breaking dishes; (2) that he encouraged his son to call Doe "crazy"; (3) that he threatened to throw away a gift of shoes and pictures that Doe had purchased and prepared for him; and (4) that he abandoned Doe at a Halloween party, leaving her with no car ride home. The court found that these alleged incidents—

14

together with Escalera's name-calling and use of profanity toward Doe—constituted a pattern of escalating behavior over a regular and long period of time. The court found that this conduct met the definition of "abuse" set forth in Family Code sections 6203 and 6320 because, although not physical in nature, it constituted conduct "disturbing the peace" of the other party—i.e., conduct that could destroy the mental or emotional calm of the other party. Because the alleged incidents of abuse were also "regular and repeat occurrences," the court ruled that they constituted propensity evidence under Evidence Code section 1109. Applying Evidence Code section 352, the court found the prejudicial effect of the evidence would not outweigh its probative value.

As set forth above in section I.B.5, Doe's parents testified at trial that she told them about multiple incidents of alleged abuse. At the close of evidence, the trial court instructed the jury based on CALCRIM No. 852A as follows: "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and based on that decision also conclude that the defendant was likely to commit and did commit the offense charged in this case. [¶] If you conclude the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider, along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charge in this case. The People must still prove the charged conduct beyond a reasonable doubt."

After the jury's verdict and prior to sentencing, Escalera filed a motion for new trial on grounds, among others, that the trial court had erroneously admitted the testimony by Doe's parents setting forth allegations of verbal abuse. Escalera's motion relied on arguments substantially similar to those he now raises on appeal. The trial court denied the motion after reiterating the reasons the court cited in support of its pretrial ruling on the admissibility of the testimony.

15

### *3. Admission of Verbal Abuse Evidence Was Not An Abuse of Discretion*

Escalera acknowledges that the applicable definition of "domestic violence" in Evidence Code section 1109 incorporates the meaning of "abuse" set forth under Family Code sections 6203, 6211, and 6320. He further acknowledges that "abuse" under these code sections includes conduct "disturbing the peace of the other party"—specifically, "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (Fam. Code, § 6320, subd. (c).) These concessions are well-taken. (See *Mani, supra*, 74 Cal.App.5th at pp. 359-360; *People v. Ogle* (2010) 185 Cal.App.4th 1138.) However, Escalera argues the trial court "engaged in a ritualistic application of these statutes" by finding that the alleged verbal abuse disturbed Doe's mental or emotional calm as grounds for admitting the testimony of Doe's parents. He asserts that upsetting a spouse's calm "does not and cannot provide the sort of rational connection to a propensity for domestic violence that the Legislature intended in enacting Family Code section 1109."

"The plain language of the statute establishes what was intended by the Legislature." (*People v. Statum* (2002) 28 Cal.4th 682, 690.) When the language is unambiguous, we look to the plain, commonsense meaning of the language used by the Legislature to determine its intent. (*Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 519.) The trial court found that Escalera's behavior, considering the totality of the circumstances, destroyed the mental or emotional calm of Doe. The court based its finding on her parents' testimony that she called them on "numerous occasions while hysterical and/or crying because of what Mr. Escalera had said or done to her." Given the plain, commonsense meaning of the language in Family Code section 6320, subdivision (c)—"destroys the mental or emotional calm of the other party"—the parents' testimony as summarized above provides substantial evidence to support the trial court's finding on this point. What Escalera characterizes as a "ritualistic application" of the statutory language is more aptly described as a

16

straightforward application of its literal meaning. A literal application of a statute's plain language does not constitute an abuse of discretion absent some ambiguity, absurd result, or other indication of contrary intent from the surrounding context and structure of the statute as a whole.

Escalera relies on the context of the language, pointing to examples of specific conduct identified as "disturbing the peace of the other party" in Family Code section 6320, subdivision (c): "This conduct *includes, but is not limited to*, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty. Examples of coercive control *include, but are not limited to,* unreasonably engaging in any of the following:" (*Ibid.*, italics added.) Subdivisions (c)(1) through (c)(5) set forth five specific examples, such as isolating the other party from friends and family; depriving the other party of basic necessities; controlling or monitoring the other party's behavior and communications; compelling the other party by force, threat of force, or intimidation to engage in or abstain from certain conduct; and engaging in "reproductive coercion." (Fam. Code, § 6320, subds. (c)(1)-(c)(5).) Escalera asserts that none of the verbal abuse described by Doe's parents constituted such examples of "coercive control" conduct.

In ruling on the admissibility of the verbal abuse testimony, the trial court made no specific finding that Escalera's conduct constituted "coercive control" as defined by Family Code section 6320, subdivision (c). Arguably, substantial evidence could support a finding that Escalera engaged in "a pattern of behavior that in purpose or effect unreasonably interfere[d] with [Doe's] free will and personal liberty"—e.g., by threatening to take custody of the children or withhold his financial support if she behaved disapprovingly. Regardless, no such finding was necessary to admit the verbal abuse evidence at issue here. The plain language of the statute states that "disturbing the peace of the other party" "includes, but is not limited to, coercive control," and engaging in coercive control includes, but is not limited to, the examples specified in subdivisions

17

(c)(1) through (c)(5). Even assuming there was no evidence Escalera engaged in coercive control, the trial court did not abuse its discretion by admitting evidence of other kinds of conduct that "disturb[ed] the peace of the other party" under subdivision (c).

Escalera contends that even if some verbal abuse conduct satisfied the applicable definition of "abuse" because it disturbed Doe's calm, the evidence should have been excluded under Evidence Code section 352 because the danger of undue prejudice substantially outweighed the probative value of the evidence. He emphasizes the difference between verbal abuse and physical violence, and he asserts the parents' testimony about verbal abuse constituted inflammatory evidence that portrayed him as a bad spouse, such that his "failings as a husband were on trial, rather than his guilt or innocence of the charges."

The trial court set forth its analysis under Evidence Code section 352 in some detail, weighing the probative value of the propensity evidence against the risk of prejudice according to the factors set forth in caselaw. (See, e.g., *People v. Wang* (2020) 46 Cal.App.5th 1055, 1076.) The court found the risk of prejudice from the evidence did not outweigh its probative value because the allegations of verbal and emotional abuse— as compared to physical violence—were neither overly inflammatory nor more severe than the charged crime. Based on the regular occurrence of the abuse, the court rejected defense counsel's characterization of this conduct as "minimally probative." The court concluded that the regular, continuing, and escalating nature of the conduct—including evidence that Escalera continued to engage in verbal abuse in the period after the charged incident—established a pattern of conduct consistent with his having a propensity to engage in domestic violence. (See *Kerley*, *supra*, 23 Cal.App.5th at p. 536 [it is the frequency, regularity, and severity of prior acts that infuses propensity evidence with probative strength].) The court further found the evidence was relevant because it tended to explain why Doe was hesitant to testify and why she minimized the abuse. Finally, the

18

court found the alleged incidents were not remote in time, and that the evidence did not risk confusing the jury or causing an undue consumption of time.

Additionally, according to Doe's statements to the police after the charged incident, Escalera's conduct during the incident bore some similarities to the other incidents involving verbal and emotional abuse. Doe told police that she and Escalera had been arguing, and that he started calling her "cunt," "cock-sucking whore" and "broke-ass bitch" just before he physically assaulted her. Doe said Escalera told their son to call her "whore" and "bitch." Doe also stated that Escalera was trying to take their son away from her during the incident—an allegation of conduct consistent with his prior threats to take custody of their children.

Escalera argues somewhat persuasively that some of the incidents described by Doe's parents amounted to comparatively minor disputes common to many marriages, far afield from the more severe kinds of domestic violence punishable under the Penal Code. To be sure, the trial court reasonably could have limited the evidence to fewer incidents, focusing only on the more abusive conduct. By the same token, evidence of the less severe behavior was also less inflammatory and presented a lesser risk of prejudice. Escalera complains of the cumulative prejudicial impact created by introducing evidence of numerous incidents, but as the trial court observed, the frequency and regularity of the abuse was also probative to a finding of propensity. As such, the court's rulings did not exceed the bounds of its discretion.

Under the deferential standard of review required here, we conclude the trial court's admission of the verbal abuse evidence was not a "manifest and unmistakable abuse of discretion." (*Davis*, *supra*, 10 Cal.4th at p. 524.) Finally, Escalera contends the evidence was so prejudicial, and its probative value so weak, that its admission violated his due process rights. (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314 ["A careful weighing of prejudice against probative value under [Evidence Code section 352] is essential to protect a defendant's due process right to a fundamentally fair trial."].) But

19

the admission of propensity evidence does not violate due process when the trial court engages in a careful analysis under the safeguards of Evidence Code section 352, as the court did here. (See *People v. Holford* (2012) 203 Cal.App.4th 155, 185.)

For the reasons above, we conclude this claim is without merit.

## B. *Admission of Testimony About the Service of Subpoenas on Doe*

Escalera contends the trial court erred in admitting testimony by two law enforcement officers about their efforts to serve Doe with subpoenas. He argues the evidence was irrelevant, and that the risk of prejudice substantially outweighed any probative value, such that its admission violated Evidence Code section 352. The Attorney General contends the trial court properly admitted the evidence after determining its probative value was not substantially outweighed by the risk of prejudice under Evidence Code section 352.

### 1. *Procedural Background*

At trial, Doe testified that she had received a subpoena to testify. She testified that Escalera and their two sons were with her at the time, and she felt awful because of "[t]he manner in which it was done," explaining that it was scary for her two sons "to hear their mother spoken to like that."

The prosecution proffered the testimony of two investigators from the district attorney's office to describe their efforts to serve subpoenas. The prosecution argued the evidence was relevant given the expert witness's testimony that abuse victims sometimes recant their initial accusations of abuse. The expert further testified that avoiding service of a subpoena and attempts to thwart investigations by law enforcement were other forms of conduct included in recantation.

Defense counsel conceded that the expert's testimony made the proffered evidence relevant, but counsel objected to it on the ground that it was cumulative because Doe had already admitted she did not want to testify at trial. Defense counsel also argued that the proffered testimony about Escalera's reaction was irrelevant.

20

The trial court overruled the defense's objections and admitted the evidence. The court ruled that testimony about Doe's reaction to service of the subpoena was relevant given that Doe had already testified about the hostile or inappropriate manner in which the investigators had served the trial subpoena on her. The court added that the expert witness's testimony made the evidence even more relevant. As to evidence of Escalera's reaction, the court ruled that it was relevant in light of the expert's testimony about dominion and control.

Investigator Amber Phillips-Cruz testified that she had been assigned to serve Doe with a subpoena to testify at the preliminary hearing. Phillips-Cruz made several attempts to contact Doe, including phone calls, leaving voicemail, sending text messages, and visiting her residence at least twice. Doe never replied to Phillips-Cruz, who was unable to contact Doe. Later, Phillips-Cruz was assigned to serve Doe with a subpoena to testify at trial. Phillips-Cruz went to Doe's residence and saw a Toyota Prius registered to her parked out front. When Phillips-Cruz knocked on the door, Escalera answered and told her Doe was not home. Phillips-Cruz also attempted to contact Doe by phone. Doe never contacted Phillips-Cruz.

Lieutenant Michael Montonye of the district attorney's office testified that he was also assigned to serve Doe with a subpoena to testify at trial. Four days after Phillips-Cruz visited Doe's residence, Montonye went to the residence with another investigator, and they surveilled it for a period of time. A Toyota Prius and a Volvo were parked in the driveway. Montonye saw Escalera come out of the residence with a child, whereupon Escalera appeared to look up and down the street, "kind of scanning it" before walking into the garage. Escalera then walked out to the Volvo parked in the driveway, and Doe walked out shortly afterwards with another child. Montonye approached Escalera and Doe and told them he had a subpoena for Doe to appear in court. Doe did not move, and she said, "It's complicated for me." Montonye put the subpoena on the back of the Toyota Prius, but Doe was "just kind of frozen and didn't move." Escalera told the two

21

investigators, "You're scaring her," so they decided to walk back to their vehicle. Eventually, Doe picked up the subpoena, whereupon she and Escalera drove away with their children.

Montonye testified that the children did not appear to be upset, and he did not hear any crying. He was not wearing his uniform because he did not want to scare the children.

At the close of evidence, the trial court instructed the jury based on CALCRIM No. 371 as follows: "Consciousness of guilt, suppression and fabrication of evidence. If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." In giving this instruction, the court made no reference to the investigators' testimony.

### 2. *Admission of the Investigators' Testimony Was Not An Abuse of Discretion*

Escalera contends admission of the investigators' testimony violated Evidence Code section 352 because the evidence was "not even marginally relevant, and was far more prejudicial than probative." He argues that the issue of whether the investigators were hostile was irrelevant, and he points out that Doe had already testified she did not want to testify at trial. Escalera acknowledges the evidence had "potential relevance" insofar as it could support an inference that Doe did not want to testify because she was under the control of her husband, but he asserts the evidence does not support such an inference.

On that point, we are not persuaded. Viewing the investigators' testimony in the context of the record as a whole, a jury could reasonably find this evidence supported an inference that Escalera exercised control over Doe's conduct. The testimony was therefore relevant to assessing the credibility of Doe's trial testimony as compared with her description of Escalera's conduct as set forth in her statements to the police. The

22

evidence was also relevant to impeach the credibility of her testimony at trial because her description of the investigators' conduct was at odds with their testimony about it. Escalera argues that impeachment on collateral matters should be excluded where it is only slightly probative of the witness's veracity, but here the evidence was relevant to the credibility of Doe's trial testimony in more than one way.

Escalera further contends the evidence constituted improper bolstering of the expert's testimony about coercive control by abusive spouses, but he cites no authority supporting this proposition. The investigators made no reference to the expert's testimony, and the expert made no reference to theirs. The trial court cited the expert's testimony as support for the relevance of the evidence—a point that defense counsel conceded—but the court did so outside the presence of the jury. Likewise, Escalera argues that the court's instruction to the jury concerning consciousness of guilt and suppression of evidence allowed the jury to draw an impermissible inference from the evidence, but the court made no reference to the investigators' testimony in giving the instruction. Regardless, Escalera's reliance on caselaw concerning the invalidity of a permissive inference is inapposite. (See *People v. Goldsmith* (2014) 59 Cal.4th 258, 269 [considering the validity of a permissive inference created by statute].) Even where a statute sets forth a permissive inference, it only violates due process "if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Ibid.*) Here, the jury could reasonably find that the investigators' testimony supported an inference that Escalera exercised a degree of control over Doe's willingness to testify candidly.

Finally, Escalera fails to explain how the investigators' testimony unduly prejudiced him. He argues that "the clear import" of the evidence was that he was a dominating and controlling person, but he does not explain how this constitutes *undue* prejudice. "The word 'prejudicial' is not synonymous with 'damaging.' [Citation.] Rather, evidence is unduly prejudicial under section 352 only if it 'uniquely tends to

evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues' [citation], or if it invites the jury to prejudge ' "a person or cause on the basis of extraneous factors." ' [Citation]." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 534.) For the reasons above, the subject of the investigators' testimony was not an extraneous factor; it was relevant to the jury's assessment of Doe's testimony, and hence relevant to the ultimate issue of guilt.

"An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citations.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) Under this standard, the trial court's admission of the investigators' testimony was not an abuse of discretion. Accordingly, we conclude this claim is without merit.

### C. *Admission of Expert Testimony on Intimate Partner Violence*

Escalera contends the trial court erred by admitting expert testimony on intimate partner violence. The Attorney General contends the trial court did not abuse its discretion in admitting the expert testimony, and that Escalera forfeited this claim by failing to object below.

#### 1. *Legal Principles*

"In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).) Expert testimony on intimate partner violence "is relevant to explain that it is common for people who have been physically and mentally

24

abused to act in ways that may be difficult for a layperson to understand." (*People v. Riggs* (2008) 44 Cal.4th 248, 293.) "The relevance of this evidence is based on the possibility that the jurors will doubt that a witness who claims to have been abused has indeed acted in the manner to which he or she testified, and therefore the jurors might unjustifiably develop a negative view of the witness's credibility." (*Ibid.*)

"The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on intimate partner battering and its effects shall not be considered a new scientific technique whose reliability is unproven." (Evid. Code, § 1107, subd. (b).)

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

### 2. *Admission of Expert Testimony Was Not An Abuse of Discretion*

Escalera argues the prosecution failed to lay a sufficient foundation for expert testimony because there was no showing Doe was experiencing the effects of intimate partner violence. He asserts Doe did not recant or minimize his domestic violence conduct in her trial testimony, such that the expert's testimony was irrelevant to assisting the jury in understanding how victims subsequently recant or minimize their descriptions of the violence.

The Attorney General contends Escalera forfeited this claim by failing to object below, and we agree. The prosecution moved in limine for the admission of expert testimony by Richard Ferry on intimate partner violence, and the record shows no objection or argument against it by the defense.[2] Even after Doe testified, defense

---

[2] Escalera's opening brief asserts defense counsel properly objected to the admission of expert testimony during oral arguments on in limine motions, but the brief

counsel did not object to the admission of Ferry's testimony, and counsel did not object at any point during Ferry's testimony. In his motion for a new trial, Escalera asserted for the first time that the trial court erred by admitting the expert testimony. The Attorney General argues that a claim raised for the first time in a motion for a new trial does not excuse a failure to timely object. (See *People v. Williams* (1997) 16 Cal.4th 153, 254 ["Defendant offers no authority for his implied suggestion that subsequent arguments in a motion for new trial may substitute for a timely objection."].) Escalera cites no authority to the contrary.

Regardless, Escalera's claim fails on the merits. First, the record does not support his assertion that Doe did not recant her initial allegations of violence or minimize Escalera's conduct in her trial testimony. At trial, Doe did not clearly reject or deny the statements she made to the police about Escalera's conduct, but she repeatedly responded to questions about the specific acts of violence she had alleged—e.g., that Escalera hit her multiple times and pinned her to the floor by putting his knee on her face or neck—by claiming to have no memory of them. Similarly, she repeatedly testified that she did not recall specific incidents of verbal abuse relayed by her parents in their testimony about Doe's phone calls to them. Expert testimony on the effects of intimate partner violence was therefore relevant to the credibility of her trial testimony as compared with the statements she made to the police and the testimony given by her parents.

At a hearing on in limine motions, the trial court ruled that the prosecution established a proper foundation for the admission of expert testimony on intimate partner violence. Based on Doe's preliminary hearing testimony, the court reasonably anticipated that she might be reluctant to testify forthrightly at trial. Her subsequent testimony—adduced prior to Ferry's testimony—supported the court's finding on this point.

cites to a portion of the record showing no such objection. The Attorney General's brief in response points out this omission, but Escalera filed no correction and no reply brief.

Given the absence of any timely objection below, Escalera has not preserved this issue for appeal.  However, even considering the merits of this claim, we conclude the trial court did not abuse its discretion by admitting expert testimony from Richard Ferry on intimate partner battering.

Finally, Escalera contends cumulative prejudice from multiple errors requires reversal of his conviction.  Because we conclude the trial court did not err with respect to any of the above claims, there is no cumulative prejudice to assess.

### III.  DISPOSITION

The judgment is affirmed.

_____
Greenwood, P. J.

WE CONCUR:


_____
Grover, J.


_____
Lie, J.


H051279 People v. Escalera